**DURACO PRODUCTS, INC., Plaintiff,**

v.

**JOY PLASTIC ENTERPRISES LTD., d/b/a Backyard Products, and Travis Products, Inc., Defendants.**

**Civ. A. No. 92–270E.**

United States District Court,
W.D. Pennsylvania.

May 25, 1993.

---

**1204**

Harry D. Martin, Craig A. Markham, Elderkin, Martin, Kelly & Messina, Erie, PA, for defendant Joy Plastic Enterprises Ltd.

W. Patrick Delaney, Marsh, Spaeder, Baur, Spaeder & Schaaf, Erie, PA, for defendant Travis Products, Inc.

## OPINION

COHILL, District Judge.

This is an action for trade dress infringement and false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) ("the Act") brought by plaintiff Duraco Products, Inc. ("Duraco") against defendants Joy Plastic Enterprises Ltd. ("Joy"), d/b/a Backyard Products ("Backyard") and Travis Products, Inc. ("Travis"). We have jurisdiction pursuant to 28 U.S.C. § 1338.

Presently before the Court is Duraco's Motion for a Preliminary Injunction, seeking to enjoin the defendants from any further marketing and sales of its Grecian style plastic planters. After a hearing, and pursuant to Fed.R.Civ.P. 52, we make the following findings of fact and conclusions of law.

### I. Findings of Fact

Duraco, a manufacturer of plastic planters previously doing business as Phillips Products Co., Inc., is a profitable Delaware corporation having its principal place of business in Illinois with roughly $35 million in annual sales. About ten percent of Duraco's business is attributable to the sales of its "Grecian Classics" plastic planters, they being the most profitable item sold by the company. Duraco's competitors in the Grecian urn market include, *inter alia,* Tucker Manufacturing Co., Rubbermaid, Inc. and one of the defendants, Joy d/b/a Backyard Products.

Defendant Joy Enterprises, located in Erie, Pennsylvania, uses the name "Backyard Products" for its lawn, garden, and patio items. Defendant Travis manufactures the molds for the plastic planters, and Joy sells the planters. The Joy planters are marketed as "Ultimate Urns."

Duraco Grecian Classics planters or urns are hour-glass shaped, plastic containers that are available on the market in two models having diameters of twelve and eighteen inches and standing roughly ten and fifteen inches high, respectively. Although lightweight because they are made of plastic, they

look like they are made of marble, cement or stone. They are also comparatively inexpensive because of their construction. The manufacturing process involves injecting molten plastic into molds or dies, allowing the plastic to cool for a time, and then emitting the planter onto a cooling surface before packaging and shipment.

Plaintiff Duraco prides itself in its excellent quality control division. For example, quality control workers remove any "flashing," or strips of plastic that form on the sides of the planters as a result of cracks in the molding or overly high production rates. Flashing may have sharp edges which can prove harmful to consumers, and is unsightly and is indicative of poor quality. Richard Husby, the Vice President of Marketing and Sales at Duraco, purchased several of Backyard's planters at a G.C. Murphy store and testified as to their comparatively poor quality, such as drooping flash, poor color and sharp edges and ridges.

The Grecian Classics planters are structured such that there are two parts, including the top "bowl" section, which the purchasing consumer manually connects at a joint to the "base" or "pedestal" of the planter. The Backyard urns have a similar construction. The Duraco planters vary in color from white, granite, blue and rose via a process in which liquid color is injected into plastic in its molten state. Travis uses a less expensive coloring process in making the Backyard Ultimate Urn.

Duraco's direct customers are largely retailers, but it also supplies the urns to distributors. Its largest customer for Grecian Classics planters is K–Mart, which buys roughly half of all planters sold by Duraco, followed by Walmart, which buys nearly one-fourth of the total number of planters sold by Duraco. Duraco manufactures the urn for roughly 52 percent of its selling price.

Duraco and the retailers typically engage in cooperative advertising, whereby they share the cost of advertising, with Duraco giving to the retailer an allowance of advertising funds based on the percentage of sales. Usually the ad allowance is for two percent of sales, whereby the buyer bills Duraco and Duraco, upon proof of advertisement and its cost, in turn gives a credit memorandum for future sales, or sometimes gives cash to the buyer. With K–Mart, Duraco has a less flexible arrangement whereby it pays K–Mart a two percent quarterly fee without actual proof of advertising being required.

Advertisements for the Duraco Grecian Classics planter appear in Sunday newspaper fliers, magazines, circulars and newspaper ads. They are depicted in concert with other outdoor garden products such as plant food and watering cans. Duraco's advertising is also directed to the retailers to whom Duraco sells its goods. Such retail-directed advertising comes in the form of brochures and trade advertisements.

The registered trademark of Duraco is the "Garden Scene" logo. Duraco encourages its retailer customers to include either the Duraco tradename or the registered trademark Garden Scene logo in their advertisements, although Duraco has not been able consistently to enforce compliance with the advertising agreement. The agreement with retailers provides that the inclusion of the logo is voluntary on the part of the retailer. When Duraco employees notice that an advertisement fails to include the Duraco logo, they report their complaints to the retailers. The Garden Scene logo appears on over half of the Duraco planters.

The Duraco urn was first conceived at the suggestion of Robert Armstrong, a K–Mart Senior Buyer who has been with that company for 35 years. He suggested the design of the Duraco planter after having attended a trade show in Cologne, Germany in 1984, when he saw similar urn-shaped planters which he knew were not as yet marketed in the United States. Armstrong met with Duraco officials, including Kenneth Sanderson, who was then the vice president of manufacturing. Sanderson Dep. at 2.[1] Armstrong described the urn he had seen as an outdoor planter with much detail.

Duraco then designed a comparable and acceptable sample. To attain the look de-

---

1. We admitted into evidence the deposition transcripts of Mr. Kenneth L. Sanderson and William Colton Hough by an Order dated April 30, 1993.

We have carefully reviewed the testimony therein.

sired by Armstrong, Duraco sought information from a number of sources. Richard Husby, Duraco Vice President of Sales and Marketing, searched for Grecian urns at statuary stores, where he bought some concrete urns to study. He also searched the Duraco literature, because the company had previously sold "rotationally molded" Grecian products.

In fact, Duraco had previously tried to sell the "Cotswold planter" (Def.Ex.D), an English-made Grecian plastics planter, around 1978 or 1979, after being approached by salesman Colton Hough of Colton Creators. Duraco abandoned the Cotswold planter in 1981 due to poor sales, which may have resulted from its relatively high price, $14.99 when compared to the Duraco/Backyard prices of under $5.00. The Cotswold planter has a higher base than the Duraco planter, but has a similar hourglass-like design. The Duraco planter has sharper lines, a lower center of gravity and a more realistic texture to it. The Cotswold model may have been in the United States market for sometime thereafter. Robert Armstrong of K–Mart testified that for K–Mart's purposes of introducing a detailed Grecian-style planter into the market, the Cotswold urn would probably have been just as acceptable as the Duraco urn.

In any event, upon seeing the prototype produced by Duraco, K–Mart made an oral commitment to buy 100,000 Grecian classic planters from Duraco. At the time, there was no plastic urn in the United States which had this look about it. In its first year on the market, sales of the Duraco eighteen inch Grecian Classics planter were quite successful: 460,000 units were sold in the first year, the best-selling item in the Duraco product line. Mr. Armstrong attributes the success of the Duraco urn to the amount of detail work on the urn.

Initially, K–Mart committed to and purchased the 18 inch planter only, but after its overwhelming success, Duraco manufactured a twelve inch planter which it also sold to K–Mart. Sales continued to soar.

Duraco first became aware of the existence of the Backyard Products planter in April 1992, when Duraco President and Chief Executive Officer John Licht was shopping in New Jersey at a retail store. Licht saw an urn, which he thought was a Duraco urn, and purchased it because it was defective; one side of it had been flattened. Such flattening is possible, Licht explained, if the product was removed while still hot from the mold and then laid on its side in the shipping carton. Licht then returned to the company and gave it to a company Vice President, asking how such a defective urn could have slipped through the quality control safety net and into the marketplace. The Vice President later came back to Licht with the news that the urn was not Duraco's, but Travis'. Licht then called the company attorney.

Thomas Gay, the President of defendant Joy Enterprises, testified that he became aware of and was involved in the conception of the Backyard urn in the 1980's, after he saw a color brochure depicting the Cotswold urn. In 1987 or 1988, he approached buyers at K–Mart and McCrory's, who already offered the Duraco product, trying to elicit information about the market possibilities for a competitor to the Duraco urn. To create a Backyard Grecian urn, Gay had access to the Tucker 18 inch urn and other urns on the market, including Duraco's. After studying the urns available on the market at that time, Gay concluded that most urns needed a deeper bowl to hold more soil and water for improved root growth, and that in general, the Duraco urns were too top-heavy. To that end, Travis's employee Joseph Soltesiz developed the plastic injection mold for Backyard, a design which Gay claims achieved the goals of added stability, depth, and maximum volume.

Several witnesses were asked to compare the appearance of the Duraco 12 inch and 18 inch planters to the appearance of the same-sized Backyard planter, and consistently made the following observations: (1) the fluting on the Duraco planter is higher along the side of the bowl than the Backyard urn; (2) the "landing" or the lip between each flute is wider on the Duraco urn than on the Backyard urn; (3) the Backyard urn has a broader base and a lower center of gravity; (4) the Backyard urn has a 20 percent higher capacity for holding soil than the Duraco; (5) the "egg and dart" patterns on the lips of the

bowls are identical, (6) the Backyard urn has a straight-edged side to the bowl, whereas the Duraco bowl curves along an arc; (7) each company's 18 inch product is simply a larger version of the 12 inch such that it has equally proportioned characteristics.

Duraco CEO John Licht explained that the Travis urns lack the quality of the Duraco urns and indicated specific problems with each Travis urn, none of which would have passed plaintiff's quality control examinations. For example, the Travis urns admitted into evidence (including Exhibits 4 and 5) have uneven edges around their bowls caused by cutting the "flashing" with a knife. Also, when holding up another Travis urn to the ceiling light, one can see spots in the bottom of the urn, which Licht explained indicates poor molding techniques. (Exhibit 6). Still other Travis urns exhibit poor color or bleeding caused by the fact that the crystals of color, used in the Travis manufacturing process, had not melted properly. (Exhibit 7).

Licht testified that the design of the 12 inch Rubbermaid planter, Exhibit 9, is different enough from plaintiff's product that anyone comparing the two would be able to tell the difference between them. He testified that the Duraco design is unique due to the total composition of all the elements, including the rim, finish, the joining of the top and bottom halves, and the color results.

Any consumer looking at the Duraco, Backyard, and Cotswold planters would say that all three are Grecian urn planters. Backyard's testing of the two products at issue in this case indicates that Duraco's planter tips over more readily than the Backyard planter.

Richard Hart, President of the Contours Consulting Design Group, called as a design expert by the plaintiff, testified that his company offers engineering and design services to companies, including Duraco. Mr. Hart explained that the Duraco/Backyard Products' designs are not the only ones which could be successful in the market within the category "contemporary interpretations of neoclassic planters using modifications of classical motifs." In fact, Mr. Hart produced five designs for Grecian classics planters (Pl. Exhibits 16—20) which he believes invoke the same classical motif as the Duraco/Back-

yard urns. The motif of these urns is maintained through variations on classical elements, including the fluting, rims, radii, pedestals, and egg and dart design on the rim of the bowl.

Hart explained that the egg and dart pattern on the rim serves the primary purpose of decoration, but that it also serves to strengthen the rim. The fluting on the bowl and pedestal of the planters, when molded properly, tends to make the urn look less like a plastic planter and more like an actual marble or alabaster planter.

A Duraco survey of consumers reported that few people have brand-name awareness in the outdoor garden products area, and that even fewer—less than one half of one percent—recognized the Duraco name. Grecian urns are purchased on impulse, rather than as a result of planning to buy a certain product once seeing it advertised.

To this observer, all of the urns introduced as exhibits, including plaintiff's, defendants' or others', looked about the same, as did those presented in drawings by Mr. Hart, the designer.

An urn is an urn is an urn.

To compete, Duraco has had to reduce its selling prices since the Backyard urn came into the market. K–Mart buyer Carlos Rodriguez had told Duraco that K–Mart could buy the urns cheaper from Backyard if Duraco did not match or better the competitor's price, which Duraco did. Yet the price reduction is not necessarily passed along to the ultimate consumer, because the retailer tries to maximize its own profits. For example, in 1992, after Duraco lowered its price, K–Mart raised its price to the consumer.

In fact, Duraco sold more units of both models of urns in 1992 (1,526,629) than in 1991 (1,223,634), despite losing some retail accounts, now held by the defendants. Duraco witnesses also estimated that the company had lost over $600,000 due to lost profits from price reductions caused by the defendants' entrance into the Grecian planter market. There were implications, but no direct evidence, of lost consumer goodwill and reputation stemming from what Duraco claims is the poor quality of the Backyard/Joy product

and the consumer confusion resulting from similarity between the parties' products.

In order to tool and begin manufacturing its product, Backyard estimates it spent from $90,000 to $95,000 on the twelve inch planter and about $140,000 for the eighteen inch planter. If an injunction were to be granted and Backyard were to manufacture a differently-designed urn, the cost of new molds would exceed these amounts, depending on the complexity of the mold.

This action also involves alleged false advertising. Defendants promoted their Grecian planter through the distribution of brochures. The photographs in these brochures depict Duraco's Grecian Classics planter and the Defendants' Ultimate Urn side by side. Pl.'s Ex. 27. The brochure claims that defendants' planter holds "20% more soil" than the Duraco planter, that Defendants' planter promotes growth and has more stability than plaintiffs'. The latter claim of stability is illustrated by a photograph showing defendants' planter in an upright position with a plant in it, adjacent to plaintiff's planter, which appears to have been knocked over, and has it contents spilling out.

## II. Conclusions of Law

When considering a motion for a preliminary injunction under Fed.R.Civ.P. 65, we must consider four factors: (1) the significance of the threat of irreparable harm to plaintiff if the injunction is not granted; (2) the state of the balance between this harm and the injury that granting the injunction would inflict on the defendants; (3) the probability that plaintiff will succeed on the merits; and (4) the public interest. *American Greetings Corp. v. Dan–Dee Imports, Inc.*, 807 F.2d 1136, 1140 (3d Cir.1986); Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* Civil § 2948 (1973). We will first address the plaintiff's likelihood of success on the merits.

### A. Likelihood of Success on the Merits

■ Since nonregistered marks have no presumption of validity, plaintiff has the burden of proving that its Grecian urns have a trade dress that is protectable under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1992), which governs unregistered trademarks. *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir.1986).

■ The Lanham Act made actionable "the deceptive and misleading use of marks" in order to "protect persons engaged in ... commerce against unfair competition." § 45, 15 U.S.C. § 1127. The Act protects unregistered trademarks "on the principle that unlicensed use of a designation serving the function of a registered mark constitutes a false designation of origin and a false description or representation." *A.J. Canfield Co.*, 808 F.2d at 296. Protection is afforded a designation only if the public recognizes it as identifying the claimant's goods and distinguishing them from those of others. *Id.* This identification stems from the determination of the level of inherent distinctiveness.

■ Trademark law, therefore, has evolved so as to divide trade dress into four categories, which are, in order of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, 112 S.Ct. 2753, 2756–57, 120 L.Ed.2d 615, 623 (1992); *Dranoff–Perlstein Assoc. v. Sklar*, 967 F.2d 852 (3d Cir.1992). A mark is entitled to protection if it fits into one of the latter two categories, arbitrary/fanciful or suggestive (and thus, is "inherently distinctive"), or if it fits into the second category, descriptive, and is buttressed by proof of secondary meaning. *Id.* Generic marks are unprotectable, as are descriptive marks that lack sufficient secondary meaning. *A.J. Canfield Co. v. Honickman*, 808 F.2d 291 (3d Cir.1986); *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983).

Duraco claims that the trade dress it seeks to protect is the:

> "particular combination and arrangement of design elements adopted by Duraco for its Grecian Classics planter ... unique and distinctive in overall appearance when it was adopted by Duraco in 1985 and remained so until Defendants' Grecian style planter was offered to the consuming public for the 1991 sales season."

Pl.'s Proposed Findings of Fact and Conclusions of Law at 2.

■ We reject any claim that Duraco's urns are arbitrary/fanciful or suggestive. An arbitrary or fanciful trade dress has no logical or suggestive relation to the actual characteristics of the subject product. *A.J. Canfield*, 808 F.2d at 296. A suggestive trade dress is one which requires imagination, thought or perception to reach a conclusion as to the nature of goods. *A.J. Canfield*, 808 F.2d at 297. The Duraco urn is clearly just that, an urn. When purchased or inspected, the consumer immediately knows the nature of the good before them: a plastic planter.

■ At best, Duraco's Grecian Classics urn is descriptive. A descriptive trade dress conveys an immediate idea of the ingredients, qualities or characteristics of the goods. *Id.* A descriptive trade dress is not inherently distinctive. In other words, when such characteristics are combined to render an overall impression, they do not inherently identify a particular source, and hence, cannot be protected absent secondary meaning. *Two Pesos*, —— U.S. at ——, 112 S.Ct. at 2757–58, 120 L.Ed.2d at 624.

As stated above, even if the product is descriptive, Duraco must prove that there is secondary meaning in order to be entitled to protection. It has not. A mark or dress has been held to have secondary meaning when it "has come through use to be uniquely associated with a specific source." Restatement (Third) of Unfair Competition § 13, Comment e (Ten. Draft No. 2, Mar. 23, 1990). Plaintiff must show that "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Secondary meaning is "generally established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark. This association suggests that the products originate from a single source." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir.1978). Secondary meaning may be found in instances where the precise name of the manufacturer is unknown, but the consumer perceives that the product emanates from a single source. *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 449 (4th Cir.1986).

■ In determining whether Duraco has met its burden of proving secondary meaning, we must consider (1) the length of time the product has been available in the marketplace, (2) the amount of product sold, (3) the nature and extent to which it has been advertised and promoted, (4) the size of the company and its share of the market; (5) other efforts creating a conscious connection in the public's mind between the feature and the plaintiff's product; and (6) the testimony of buyers. *Ginger Group, Ltd. v. Beatrice Cos.*, 678 F.Supp. 555, 560 (E.D.Pa.1988).

We are not persuaded that the Duraco urn has secondary meaning. The product has been on the market for over five years and has done very well. There was no evidence that consumers, whether K–Mart buyers or retail customers, perceived that the product emanates from a single source, or, for that matter, that the public identified the Duraco planter with the Duraco or Garden Scene name. The consumer does not appear to be moved in any degree to buy the Duraco planter *because of its source*. Buyers for the K–Mart stores seemed to be motivated largely by their profit margin. Duraco has not made fruitful efforts to connect the product with the Duraco/Garden Scene name. K–Mart advertisements publish the logo or company name "more often than not." In a plaintiff-sponsored survey of the Grecian planter market, it was concluded that consumers have very little awareness of the Duraco name, and little product-to-name knowledge. Testimony also consistently revealed that the consumers purchased the vast majority of the planters on impulse, without associating any manufacturing source with any planter, without any thought given to the fact that numerous companies make what could readily be called classically-styled Grecian urns.

■ A generic trade dress is not registrable as a trademark, and refers to the "genus of which the particular product is a species." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). In other words, generic marks are commonly used names for a type, kind or genus of goods. *Forum Corp. of North America v. Forum, Ltd.*, 903 F.2d 434,

444 (7th Cir.1990). We think the Duraco product is generic, and thus, is unentitled to protection.

In addition to the distinctiveness issue, plaintiff must also demonstrate that its mark is non-functional, because functional marks, regardless of their distinctiveness or the existence of secondary meaning, are not protectable. *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2758. This is plaintiff's burden. *Merchant & Evans, Inc. v. Roosevelt Bldg. Products, Co.,* 963 F.2d 628, 633 (3d Cir. 1992). In order to be non-functional, plaintiff must show that a feature or design, when omitted, fails to cause substantial loss of value, or that a specific element of the product serves no purpose other than as an identification of the source. *Id.* Decorative elements can be functional if they serve a utilitarian function. *Keene Corp. v. Paraflex Industries, Inc.,* 653 F.2d 822, 825 (3d Cir. 1981). The availability of alternative designs does not automatically render a design non-functional. *Id.* at 827. Where a combination of product design features form the trade dress allegedly infringed, as in this case, the appropriate inquiry is whether the product's features taken collectively are functional. *Hartford House, Ltd. v. Hallmark Cards, Inc.,* 846 F.2d 1268, 1272 (10th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988).

The design elements of both the parties' urns are functional, in our view, because they are all necessary for classically styled urns, which in combination create the illusion of an alabaster chiseled urn.

Moreover, in order to find liability in their case in chief, plaintiff must also demonstrate that there is a likelihood of confusion among consumers as to the *source* of the plaintiff's product. *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2758. Consumer disinterest in the identity of the manufacturer of a product renders the confusion issue unactionable. *West Point Mfg. Co. v. Detroit Stamping Co.,* 222 F.2d 581, 591 (6th Cir.), *cert. denied* 350 U.S. 840, 76 S.Ct. 80, 100 L.Ed. 749 (1955). Several factors are relevant, including the similarity of design and of the products themselves, the degree of care involved in making purchasing decisions, similarity of marketing and purchasers, and evidence of actual confusion. *Lisa Frank, Inc. v. Impact Int'l, Inc.,* 799 F.Supp. 980 (D.Ariz.1992).

While we are at liberty to consider the defendants' alleged copying in our determination of the likelihood of confusion, *American Home Products v. Barr Laboratories,* 834 F.2d 368, 371 (3d Cir.1987), the evidence presented clearly shows that there has not been any consumer confusion as to the source of the Duraco product. Even though Duraco's president mistakenly identified the defendants' product as one of its own, this hardly proves confusion is likely among the general public or the buyers. We find that the two planters are very similar in overall appearance and that the parties have used similar advertising methods. We have not seen any evidence that buyers purchased a Backyard urn thinking it was a Duraco urn.

The plaintiff also seeks relief from alleged false advertising on the part of the defendants. Advertising violates § 43(a) of the Lanham Act when there has been a false or misleading description or representation of one's own or another's product. 15 U.S.C. § 1125(a)(2). The core test for false advertising includes the following elements: (1) whether there has been a false or misleading statement as to a product; (2) actual deception or tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised good travelled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff. *Max Daetwyler Corp. v. Input Graphics, Inc.,* 545 F.Supp. 165, 171 (E.D.Pa. 1982).

We do not believe that there is a reasonable basis for believing that the plaintiff is likely to be damaged as a result of the alleged false advertising, described *supra* in our Findings of Fact. *Upjohn Co. v. Riahom Corp.,* 641 F.Supp. 1209, 1224 (D.Del. 1986). There has been no evidence of actual deception, or a tendency to deceive, nor has there been conclusive evidence of the falsity of the claim that the Backyard/Travis Ultimate Urn is *not* more stable than plaintiff's. Hence, the likelihood of success on the merits of the false advertising claim is very low.

For the foregoing reasons, we hold that the likelihood of success on the merits is slim in this case. We now turn to the next prong of the preliminary injunction analysis.

### B. Threat of Irreparable Harm

The threat of irreparable harm to the plaintiff if the preliminary injunction is not granted would be minimal in this case.

■ Duraco argues that it would be irreparably harmed due to its inability to control the quality of defendants' product, the loss of profits due to lowering price levels, and the likelihood of confusion between Duraco's and the defendants' trade dress, all of which would harm Duraco's reputation. Duraco's sales have been at healthy levels, even since the time that defendants' product entered the market. We find this conclusion to be without merit.

### C. Balance of Harms

■ The likelihood of harm to the plaintiff if a preliminary injunction is not issued is rather small. Thus, the balance of plaintiff's harms *vis.* the defendants' harms is small. Defendants, whose companies heavily rely on the production of the urns for their survival, stand to lose their entire business if they are enjoined from further manufacture and sales of their Ultimate Urn. Plaintiff, on the other hand, carries many other product lines, has increased its sales, has not shown any direct evidence of loss of customer goodwill or reputation, and has not shown a likelihood of confusion among consumers.

### D. Public Interest

We agree that there is a general public interest in open competition, and in the Lanham Act's goal of federal protection of trade dress. *SK & F, Co. v. Premo Pharmaceutical Labs., Inc.*, 625 F.2d 1055, 1067 (3d Cir. 1980). But in this case, there has not been shown any confusion on the part of consumers at all. Rather, the public has an interest in a healthy, competitive market which results in lower prices for popular goods.

### CONCLUSION

We find the assertion of a right to a preliminary injunction by the plaintiff to be without merit. We do not believe that addi-

tional evidence from the plaintiff will change this opinion. Pursuant to Fed.R.Civ.P. 65(a)(2), the evidence which we have already received and considered would not have to be repeated at a trial on the merits.

If plaintiff wishes to introduce additional evidence at a hearing on the merits for a final injunction, it should notify the court within thirty days from the date of this order, otherwise a final judgment will be entered in favor of the defendants.

For all of the the foregoing reasons, we do not believe that the granting of a preliminary injunction is warranted in this case.

It is so ordered.