**R&B, INC.**

v.

**NEEDA PARTS MANUFACTURING, INC., et al.**

No. Civ.A.01–1234.

United States District Court, E.D. Pennsylvania.

Aug. 23, 2005.

Anthony S. Volpe, John J. O'Malley, Volpe & Koenig PC, Philadelphia, PA, for R & B, Inc.

Anthony R. Sherr, Mayers Mennies & Sherr LLP, Blue Bell, PA, Douglas W. Sprinkle, Clifford, Groh, Gary A. Hecht, Joseph F. Posillico, Synnestvedt and Lechner, Julie A. Greenberg, Gifford, Krass, Groh, Sprinkle, Patmore, Anderson & Citkowsk, Birmingham, MI, for Needa Part Manufacturing, Inc., et al.

## MEMORANDUM AND ORDER

MCLAUGHLIN, District Judge.

This case involves a dispute between the largest supplier in the after-market for automotive parts, R & B, Inc. ("R & B"), and a new competitor in that market, Needa Parts Manufacturing, Inc. ("NPM"). R & B claims that NPM and its CEO, James Koleszar, infringed R & B's copyrights and trademarks.

The Court held oral argument on the defendants' motion for partial summary judgment on April 6, 2005. The Court will now grant the motion.

### I. Claims and Procedural Posture

R & B's complaint, filed on March 15, 2001, makes the following claims against the defendants: (1) trademark infringement in violation of 15 U.S.C. § 1055; (2) common law trademark infringement; (3) false designation of origin in violation of 15 U.S.C. § 1125(a); (4) common law unfair competition; (5) copyright infringement in violation of 17 U.S.C. § 101, et seq.; (6) breach of contract; (7) breach of fiduciary duty; and (8) tortious interference with contractual relations.

The Court previously denied the plaintiff's motion for a temporary restraining order and preliminary injunction on the ground that the plaintiff failed to show a likelihood of success on the merits with respect to any of its claims. R & B appealed this Court's decision, and in an Order dated August 20, 2002, the United

States Court of Appeals for the Third Circuit affirmed the denial of R & B's motion for preliminary injunction. *R&B, Inc. v. Needa Parts Mfg., Inc.,* 50 Fed.Appx. 519 (3d Cir.2002).

The parties resumed discovery, and the plaintiff filed a motion for partial summary judgment on its NEED! trademark infringement claim. The Court denied the motion on January 30, 2004, finding that genuine issues of material fact remained on the claim.

The defendants filed a motion for partial summary judgment on March 31, 2004, but the Court held the motion in abeyance at the request of counsel while the parties engaged in settlement discussions. After counsel notified the Court that they were unable to reach a settlement, the Court scheduled oral argument on the motion for December 10, 2004. When the Court met with counsel that morning, counsel requested that the Court postpone oral argument because they were close to reaching an agreement that would resolve the case. The Court conducted multiple telephone conferences with counsel over the next several weeks; however, settlement negotiations again broke down and counsel requested that the Court reschedule the oral argument.

The defendants move for summary judgment on four sets of claims, including: (1) the plaintiff's claims that the defendants infringed R & B's copyrights in its sales catalogs and part numbers; (2) the plaintiff's claims that the defendants infringed R & B's unregistered trademarks "MM" and part numbers; (3) the plaintiff's claims that the defendants' repackaging and resale of R & B products constitutes trademark infringement, false designation of origin, and common law unfair competition; and (4) the plaintiff's state claims for breach of contract, breach of fiduciary duty, and tortious interference with contractual relations arising from the alleged breach of a "Confidentiality and Development Agreement" that the defendant Koleszar entered into during his employment with R & B.

The defendants have not moved for summary judgment with respect to the plaintiff's claims that the defendants infringed R & B's registered trademark "NEED!" Defs'. Mem. at 20 n. 14. The plaintiff has clarified that it is not pursuing a claim that the defendants infringed the "Motormite" mark. Pl's. Mem. in Opp. at 18 n. 9.

## II. *Statement of Facts*

The parties each introduced multiple exhibits into the record for purposes of the summary judgment motion, including the transcript of the preliminary injunction hearing that took place April 18 and 19, 2001; the deposition testimony of Barry Myers, Robert Calvosa, Albert Baldino, and James Koleszar; the declaration of Barry Myers; a photocopy of NPM's 2001 Catalog; photocopies of R & B's 1994 and 1985 Catalogs; photocopies and samples of Motormite products in Needa? packaging; photocopies of R & B's trademark and copyright registrations; and a copy of the Confidentiality and Development Agreement that Koleszar entered into while he was employed by R & B.

The Court has reviewed all the evidence that was introduced by the parties in connection with this motion. The Court has not adopted the findings of fact that the Court made in deciding the motion for preliminary injunction unless the facts are not in dispute. Where the facts are in dispute, the Court has viewed the facts and all inferences to be drawn from the facts in the light most favorable to R & B as the nonmoving party.

The plaintiff, R & B, is a national supplier of about 35,000 automotive parts, fasteners, and service line products, as well as non-automotive fasteners. Transcript

of Apr. 18, 2001 Hearing at 164 (testimony of Robert Calvosa) (hereinafter "Tr. I"). R & B's total sales are approximately $200 million per year. Tr. I at 179 (testimony or Robert Calvosa); Pl's. Ex. D at 19 (deposition testimony of Barry Myers).

The defendant, NPM, was formed in July of 2000 to compete with R & B in the automotive parts market. Transcript of Apr. 19, 2001 Hearing at 60–61 (testimony of James Koleszar) (hereinafter "Tr. II"). NPM currently offers about 1,000 different products and has had sales of approximately $18,000 since its inception in July 2000. Tr. II at 26 (testimony of James Koleszar). The defendant, Koleszar, is the Chief Executive Officer of NPM. Tr. II at 23 (testimony of James Koleszar). Koleszar was employed by R & B from approximately 1984 to 1998. Tr. II at 21 (testimony of James Koleszar). At the time of his resignation in 1998, Koleszar's title was Vice President of National Accounts. Tr. II at 21 (testimony of James Koleszar). Shortly after Koleszar started working at R & B, he executed a "Confidentiality and Development Agreement." Pl's. Ex. F.

R & B Automotive, Inc., an entity that later changed its name to R & B, registered the mark "Motormite" with the United States Patent and Trademark Office ("USPTO") in July 1983 (Registration No. 1,244,128). Pl's. Ex. A. In July 1991, R & B registered another trademark for "Motormite" with the USPTO (Registration No. 1,649,280). Pl's. Ex. A.

Of the 35,000 different items offered by R & B, about 18,000 are sold under the two "Motormite" trademarks. Tr. I at 164 (testimony of Robert Calvosa); see 1994 Motormite Buyers Guide, Defs'. Ex. 10 (hereinafter "1994 Catalog" or "R & B's Catalog"). These items are sold under various product lines or brands, such as "CLUTCH–IN!," "PEDAL–UP!," and "HELP!." See 1994 Catalog, Defs'. Ex. 10. Most of these product lines are specific to

either a category of parts or to a type of repair. Tr. I at 88 (testimony of Robert Calvosa). The HELP! line consists of R & B's best selling "hard-to-find" products. Tr. I at 86–88 (testimony of Robert Calvosa). The HELP! line is further subdivided into five categories which correspond to five sections of a car—interior, exterior, underhood, undercar, and maintenance. See 1994 Catalog, Defs'. Ex. 10.

Approximately two thirds of the automotive parts that R & B supplies under the "Motormite" trademarks are sold to two types of consumers: retailers and warehouse distributors. Pl's. Ex. D at 23 (deposition testimony of Barry Myers). Automotive retailers, such as Pep Boys and Autozone, purchase products directly from R & B and resell them to do-it-yourself members of the general public ("DIYers"). Warehouse distributors, such as Auto Value and Car Quest, purchase products directly from R & B and resell them to jobbers, which are smaller independent auto part stores. The jobbers then resell the products to professional installers who use the products in the course of providing car repair services to the general public. R & B also attempts to sell its products directly to the jobbers. The DIYers and the professional installers constitute the "end users" of R & B products. Tr. I at 203–05, 207–09 (testimony of Todd Northey).

R & B also sells products in bulk. Bulk products do not come in packages. R & B sells to different kinds of bulk customers, including repair shops, such as Midas Muffler, that use the product immediately; companies that resell the product to jobbers or installers after repackaging it; manufacturers that incorporate the parts into their own unrelated products, such as exercise bicycles; and direct competitors that may repackage the R & B product with their own products. For example, R

& B may sell a wheel stud nut to a competitor which primarily sells brakes. The competitor then repackages the R & B stud nut with its own brake product and distributes the combined product to its customers. Tr. I at 200–02 (testimony of Todd Northey).

R & B has entered into agreements with some of its bulk customers that govern the way that the bulk customer may use or resell the R & B part. Tr. I at 255–56 (testimony of Todd Northey). R & B has an informal understanding with other of its bulk customers. Tr. I at 270 (testimony of Todd Northey). R & B does not have formal or informal agreements with warehouse distributors as to how its products may be sold. Tr. I at 306 (testimony of Barry Myers).

Some of R & B's Motormite products have the letters "MM" embossed or forged into them. Tr. I at 251–52 (testimony of Todd Northey). The "MM" designation has not been registered as a trademark with the USPTO. Because of the vertical configuration of the two letters, the designation sometimes appears as a thick "M." Todd Northey, R & B's vice president of field sales and a former regional sales manager, has witnessed some of R & B's customers identify the "MM" designation with Motormite. Tr. I at 235, 250–51 (testimony of Todd Northey).

Motormite products are sold through R & B's catalogs. R & B registered the following catalogs with the Copyright Office: 1985 MotorMite Catalog (Registration No. VA 196–809); Spring 1985 MotorMite Catalog Supplement 1 (Registration No. VA 193–362); Fall 1985 MotorMite Catalog Supplement 2 (Registration No. VA 208–040); 1983 Help! Catalog (Registration No. VA 195–445); and 1983 Help! Supplement Catalog (Registration No. VA 193–276). Pl's. Ex. B.

The 1994 Catalog is the current Motormite catalog and contains about 685 pages.

The 1994 Catalog is organized into separate sections for each Motormite product line. 1994 Catalog, Defs'. Ex. 10.

Each Motormite product is identified in the catalog and on the product packaging by a five-digit part number. Tr. I at 103–05 (testimony of Robert Calvosa). These part numbers were independently created by R & B but have not been registered as trademarks with the USPTO.

The first two digits of each five-digit part number indicate the "family" of the product. For example, a number with the first two digits "76" belongs to the family of window handles. Tr. I at 143 (testimony of Robert Calvosa); Tr. I at 285 (testimony of Barry Myers). When the system was first developed, the first two digits were assigned in an arbitrary fashion, i.e., the number "76" has no logical relationship to window handles as compared to any other randomly selected numbers. Tr. I at 43–45, 134 (testimony of Robert Calvosa); Tr. I at 285 (testimony of Barry Myers).

The remaining three digits of each R & B part number are assigned according to a different rubric for each product family. The rubric for one product family does not necessarily apply to other product families. Tr. I at 151–52, 163 (testimony of Robert Calvosa). R & B's numbering system for any given family of products is ultimately adopted after consultation and approval from several individuals, including the new product manager and the company's executive committee. Pl's. Ex. C at 81–85, 153–54 (deposition testimony of Robert Calvosa).

R & B attempts to design a rubric for assigning numbers within each product family that corresponds with the significant characteristics of the products within that family. Tr. I at 159–63 (testimony of Robert Calvosa); Pl's. Ex. C at 45–46 (deposition testimony of Robert Calvosa).

For example, within the 47000 series, the 300 range represents plastic vacuum connectors; the 400 range represents rubber vacuum connectors; and the 500 range represents nylon and vinyl vacuum connectors. Tr. I at 151–52 (testimony of Robert Calvosa).

For a handful of product families the products are numbered sequentially to reflect the relative size of the product as compared to others in the same product category. For example, snap rings are first divided into three categories—E-clips, internal snap rings, and external snap rings—and then the numbers within each category are assigned by size depending on the critical dimension of the product, i.e., E-clip numbers are assigned in size order depending on the internal diameter and internal snap ring numbers are assigned in size order depending on the outside diameter. In no case do the numbers denote the actual size of the product. Tr. I at 61–65, 148 (testimony of Robert Calvosa); Tr. I at 286 (testimony of Barry Myers).

For certain other products, the final three digits represent the size of the product packaging. For example, in the family of pedal pads, parts requiring size "A" packaging have part numbers ranging from 20700 and 20749. Tr. I at 53–59 (testimony of Robert Calvosa). Within at least one product family, the family of O-rings, the last three digits of the part number correspond to the industry standard reference number for that part. Tr. I at 143, 146 (testimony of Robert Calvosa).

Once within the appropriate range, or when there is no rubric for number assignment within a family, part numbers are assigned sequentially. Tr. I at 153 (testimony of Robert Calvosa). R & B sometimes assigns a lower number to popular products within the product family to affect how the product is merchandised, i.e.,

parts are usually organized in numerical order so lower-numbered products will be placed toward the front of a store display. Tr. I at 53–59, 83–84 (testimony of Robert Calvosa).

When R & B comes out with a new product or a new line of products, they first look to see if the new products should be added to an existing family. Tr. I at 45–46 (testimony of Robert Calvosa). If so, the products are assigned numbers according to the existing rubric for the family. Pl's. Ex. C at 82 (deposition testimony of Robert Calvosa).

If the new products are not added to an existing family, they are randomly assigned a two digit prefix to represent the new family. Tr. I at 46–47 (testimony of Robert Calvosa). R & B must then develop a rubric for assigning numbers within the family. Pl's. Ex. C at 80–85 (deposition testimony of Robert Calvosa).

As R & B develops a rubric for numbering products within a new family, it must decide how many numbers or blocks of numbers to reserve for future expansion within the product line. Tr. I at 46 (testimony of Robert Calvosa). R & B makes this decision after considering factors such as the product's characteristics, application, anticipated demand, and potential for future development. Tr. I at 46–48, 66–67 (testimony of Robert Calvosa). For example, where the last three numbers represent the relative size of the product, R & B may reserve numbers before, after, or in between the assigned numbers if it anticipates that smaller or larger products may be added. Tr. I at 65–67 (testimony of Robert Calvosa). Although R & B attempts to reserve enough numbers to accommodate future expansion, they have not always been successful. Tr. I at 73–80 (testimony of Robert Calvosa).

If R & B runs out of numbers for a particular product line, it will reserve a

new block of numbers. Although R & B tries to reserve the new block either immediately before or after the original block within the same product family, this may not be possible if those numbers are already being used. Tr. I at 131–35 (testimony of Robert Calvosa). In such cases, R & B may either "borrow" numbers from another product line or open a new family group. Tr. I at 136 (testimony of Robert Calvosa). Thus, the correlation between the first two digits and the product family is not always perfect. For example, when a group of products in the CLUTCH–IN! family outgrew its initial range of 14500 to 14549, the family first expanded to the range from 14591 to 14599, and then to the range below 14500. When those ranges were exhausted, the family expanded to numbers beginning with the first two digits 74. Tr. I at 79–82 (testimony of Robert Calvosa).

The HELP! product line consists of about 700 of the most popular and fast-moving automotive replacement parts sold by R & B, some of which are also available under other Motormite product lines. Tr. I at 85–87, 93 (testimony of Robert Calvosa). The HELP! line of products is divided into five general categories which correspond to five sections of a car and each of which is associated with a different color for use on product packaging. Tr. I at 93 (testimony of Robert Calvosa); Tr. I at 245–46 (testimony of Todd Northey). R & B uses this system to help the retailer organize products on the display and to help the customer find products in the catalog or on the display in a retail store. Tr. I at 93–94, 97–98 (testimony of Robert Calvosa); Tr. I at 119–20 (testimony of Todd Northey).

R & B uses a different rubric for assigning product numbers within the HELP! line. Tr. I at 86 (testimony of Robert Calvosa). Within HELP!, the first two digits represent the family of the product and the third digit represents a subgroup within the family. Tr. I at 91 (testimony of Robert Calvosa). The final two digits are assigned sequentially. Tr. I at 91, 144 (testimony of Robert Calvosa).

Todd Northey, the plaintiff's vice president of field sales and a former regional sales manager, has experienced instances where professional installers ordered parts from a jobber by reference to the part numbers, as well as instances where the jobber discussed parts with R & B salespeople by reference to the part numbers. Tr. I at 191, 209–11, 212–14 (testimony of Todd Northey). This normally happens only with respect to R & B's most popular parts that have repeat usage. Tr. I at 214 (testimony of Todd Northey). Mr. Northey has also experienced a "handful" of instances where customers in retail stores asked for a part by part number. Tr. I 214–16 (testimony of Todd Northey). R & B does not use the part numbers in its promotion or advertising. Tr. I at 308 (testimony of Barry Myers).

NPM was formed in 2000 to compete with R & B in the automotive parts market. Tr. II at 60–61 (testimony of James Koleszar). NPM targets some of the same customers as R & B and identifies itself as a competitor of R & B. Tr. II at 43–45, 70 (testimony of James Koleszar). NPM sells its products under the name "Needa?".

NPM currently has inventory worth approximately $800,000. Tr. II at 25 (testimony of James Koleszar). NPM acquired some of its inventory by purchasing genuine Motormite parts from warehouse distributors and retailers. Pl's. Ex. D at 234 (deposition testimony of James Koleszar); Tr. II at 27–28 (testimony of James Koleszar).

NPM packages genuine Motormite parts in Needa? packaging. Pl's. Ex. D at 235 (deposition testimony of James Koleszar). When NPM purchases Motormite parts

from retailers, NPM has to remove the product from the Motormite packaging before it can repackage the product in Needa? packaging. Pl's. Ex. D at 235 (deposition testimony of James Koleszar).

At least with respect to some of the products that NPM sells, the "MM" designation can be seen on the part through the Needa? packaging. In no case does the "MM" designation appear on the Needa? packaging. Pls'. Exs. 1A–0.

NPM's business philosophy is to sell the most popular and fastest moving auto parts. Tr. II at 68 (testimony of James Koleszar). To identify the most popular parts, Koleszar requested data from several automotive retail stores. Tr. I at 29 (testimony of James Koleszar). Koleszar also reviewed movement rating reports that R & B distributes to customers and potential customers throughout the industry. Tr. I at 32–33 (testimony of James Koleszar).

Needa? lists its products in a catalog entitled "Needa? Parts Manufacturing, Inc. Application and Buyer's Guide 2001." NPM Catalog, Defs'. Ex. 8. NPM's catalog consists of approximately 85 pages. *Id.* The defendants used R & B's catalog in preparing their own catalog. Tr. II at 42 (testimony of James Koleszar).

Needa? products are identified by a six digit number. Tr. I at 102–05 (testimony of Robert Calvosa). The first five digits correspond to R & B's number. Tr. I at 103–05, 109 (testimony of Robert Calvosa); Tr. I at 243–44 (testimony of Todd Northey); Tr. II at 35 (testimony of James Koleszar). The sixth digit indicates NPM's recommendation as to where the product should be placed in a retail store. Tr. II at 35 (testimony of James Koleszar). NPM copied R & B's first five digits to make it easier for customers to switch from Motormite to Needa? products. Tr. II at 35, 39 (testimony of James Koleszar).

Some of the categories represented by NPM's sixth digit correspond with the color codes that R & B uses to categorize the HELP! line of products. Tr. I at 92–96, 101–02 (testimony of Robert Calvosa); Tr. I at 244–45 (testimony of Todd Northey). For example, NPM's number "3" corresponds to the HELP! under-hood category. Tr. I at 101 (testimony of Robert Calvosa). However, the NPM system contains more categories than the HELP! system. Tr. II at 73–74 (testimony of James Koleszar); *see* NPM Catalog, Defs'. Ex. 8.

III. *Analysis*

A motion for summary judgment will be granted where all of the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The nonmoving party may not simply rest on the pleadings, but must go beyond the pleadings in presenting evidence of a dispute of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the Court must view the facts and all inferences to be drawn from the facts in the light most favorable to the non-moving party. *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 637 (3d Cir.1993).

█ The Court's findings of fact and conclusions of law made in connection with the plaintiff's motion for a preliminary injunction are not binding with respect to the present motion for summary judgment. *See St. Thomas–St.John Hotel & Tourism Ass'n v. Government of Virgin Islands,* 357 F.3d 297, 302 (3d Cir.2004) (citations omitted). The Court must consider any new evidence or intervening law, and the Court must apply the summary judgment standard to the evidence, i.e., the Court must consider the facts and all inferences to be drawn from the facts in the light

most favorable to R & B as the nonmoving party. *See id.*

## A. *Copyright Infringement*

■■■ R & B contends that the defendants infringed its copyright in its 1994 Catalog and in its part numbers. The Copyright Act of 1976 protects "original works of authorship fixed in any tangible medium of expression...." 17 U.S.C. § 102(a). A copyright holder is granted the exclusive right to use and to authorize others to use the copyrighted work in specific enumerated ways, including the reproduction of the work in copies. *See* 17 U.S.C. § 106. To succeed on the merits of the copyright claims, R & B must show (1) that R & B owns a valid copyright in the material, and (2) that NPM copied the material in question. *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 290 (3d Cir.1991); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222, 1231 (3d Cir.1986).

### 1. *Part Numbers*

■■■ The primary claim brought by R & B is that the defendants infringed its copyright by copying the most popular Motormite part numbers. The defendants concede that they copied the part numbers of about 1,000 of the plaintiff's 18,000 Motormite parts. Tr. I at 35 (Koleszar Test.) The issue presented is whether the part numbers satisfy the originality requirement of the copyright laws.

It is important to note at the outset that the plaintiff's claim is based on the alleged copying of R & B's part numbers. Although the plaintiff refers to its part numbers and part numbering system interchangeably, the plaintiff does not claim, and has introduced no evidence to support a claim, that NPM used R & B's part numbering system. *See* Apr. 6, 2005 Oral Argument Tr. at 13 (statement of Anthony Volpe). For example, the plaintiff does not allege that NPM developed a new part

and used R & B's numbering system to assign a number to that new part. The Court, therefore, will analyze the plaintiff's infringement claim with respect to R & B's part numbers.

Copyright protection extends to "original works of authorship" under 17 U.S.C. § 102(a). The Supreme Court has held that the term original "means only that the work was independently created by the author, and that it possesses at least some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). R & B's part numbers were independently created by R & B. Tr. I at 39–48 (testimony of Robert Calvosa). The question is whether R & B's numbers possess the "minimal degree of creativity" required to qualify them for copyright protection.

The Court addressed this same question in deciding the plaintiff's motion for preliminary injunction. At the time that the Court decided the preliminary injunction motion, the Court of Appeals had recently analyzed the originality requirement in the context of part numbers. *See Southco, Inc. v. Kanebridge Corp.,* 258 F.3d 148 (3d Cir.2001) ("*Southco I*"). In that case, the Court of Appeals held that Southco's part numbers fell short of the minimal level of creativity required for copyright protection. *Id.* at 152.

The Court analyzed the plaintiff's motion for preliminary injunction in light of the Court of Appeals' decision in *Southco I* and concluded that although R & B's part numbers are somewhat less predictable than Southco's numbers, R & B's part numbers are not copyrightable because they lacked sufficient creativity to satisfy the originality requirement. Court Order of 8/10/01 at 23. The Court of Appeals affirmed the Court's denial of the preliminary injunction, agreeing that R & B's

part numbers are not materially different from the part numbers in *Southco I*. 50 Fed.Appx. 519, 521–22.

The Court of Appeals subsequently issued two additional decisions in *Southco*. In the second *Southco* decision, a panel of the court reversed the grant of summary judgment to the defendant after finding material issues of fact remained on the plaintiff's copyright infringement claim. *Southco, Inc. v. Kanebridge Corp.*, 324 F.3d 190 (2003) ("*Southco II*"). The Court of Appeals rendered its decision in *Southco II* prior to the time that the defendants filed the present motion for summary judgment, and both parties discuss the impact of the *Southco II* decision on this case in their respective briefs.

After the parties filed their briefs for this motion but prior to oral argument, the Court of Appeals issued its third and final decision in *Southco*. *Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276 (3d Cir. 2004) ("*Southco III*"). During oral argument on the defendants' motion for summary judgment, the plaintiff gave the Court a bench memo that addresses the Court of Appeals' decision in *Southco III* (the plaintiff's "Bench Memo"). Following oral argument, the plaintiff submitted an additional brief in response to the Court's inquiries during oral argument (the plaintiff's "Post–Argument Brief"). Thus, the plaintiff has had ample opportunity to address any legal issues raised by the intervening case law.

In *Southco III*, the Court of Appeals decided that Southco's part numbers are not copyrightable based on two different and independent lines of reasoning. *Id.* at 281. Under the first line of reasoning, the Court of Appeals held that the Southco numbers are not "original" because they do not reflect any creativity; rather, each number is dictated by the logic of the Southco numbering system. *Id.* 281–82.

Southco used a numbering system that divided products into product classes and reflected the relevant characteristics of the products within each product class. *Id.* at 282. Prior to assigning the numbers, Southco had to determine which relevant characteristics should be reflected in the numbers and devise the rubric to be used to express those characteristics. *Id.* at 282–83. Once the numbering system was developed, however, the numbers were assigned through a mechanical application of the system. *Id.* The Court of Appeals found, therefore, that although Southco may have used creativity to develop the numbering system, the numbers themselves did not reflect any creativity. *Id.* at 281–83.

Like the part numbers in *Southco*, the first two or three digits of R & B's part numbers indicate the product family. Tr. I at 143 (testimony of Robert Calvosa); Tr. I at 285 (testimony of Barry Myers). The remaining two or three digits are assigned according to a specific rubric for the product family. R & B attempts to design a rubric for each product family that corresponds to the relevant characteristics of the products within that family. Tr. I at 159–63 (testimony of Robert Calvosa).

R & B has spent considerable time in developing the rubric for each family of products. For example, when a new product comes out, R & B has to decide whether the product fits within an existing product family or whether it belongs in a new product family. If R & B does create a new product family, it has to develop the rubric for that product family and decide how many numbers to reserve for future expansion within the product line. Tr. I at 46 (testimony of Robert Calvosa); Pl's. Ex. C at 81–85 (deposition testimony of Robert Calvosa).

Once the system is in place, however, numbers are assigned by applying the rubric. Pl's. Ex. C at 82–83 (deposition testimony of Robert Calvosa). Thus, to the extent that there is any creativity in the process, it occurs at the system development stage, and not at the point where R & B actually assigns a number to a particular product.

This system does not yield perfect results. The numbers produced by R & B's system are not correlated with the parts to the extent and with the predictability that the *Southco* numbers are, but most inconsistencies are due to human error, such as underestimating future product expansion, and are not the result of creativity. Tr. I at 142 (testimony of Robert Calvosa).

The plaintiff attempts to distinguish this case from *Southco III* by arguing that R & B's part numbers are not dictated by the system. In support of this argument, however, the plaintiff states that R & B's numbering system contains a "creative element" that is constantly changing. Pl's. Bench Memo at 4 (citing Robert Calvosa's deposition testimony). The plaintiff further states that R & B's assignment of numbers is a "collaborative" effort that requires many people to determine the creative elements of the numbering system. *Id.* at 4–5. Thus, despite the Court of Appeals' en banc decision in *Southco III*, the plaintiff continues to focus on the effort and creativity that R & B put into developing the numbering system. The plaintiff has failed to cite any new evidence which would distinguish R & B's part numbers from the Southco numbers or lead this Court to a different conclusion than it reached at the preliminary injunction stage.

The *Southco III* majority adopted a second line of reasoning for denying copyright protection to Southco's part numbers. 390 F.3d at 281. Adopting the "long standing" practice of the Copyright Office, the court held that the Southco part numbers are not entitled to copyright protection because they are analogous to short phrases or titles of works which lack a sufficient amount of text to show the requisite creativity. *Id.* at 285–86. The court also expressed concern that if a part number were copyrightable, any use of the number would potentially infringe the copyright. *Id.* at 286.

The Court finds that R & B's part numbers are not copyrightable under either line of reasoning. First, although considerable time and creativity may have gone into developing R & B's numbering system, the numbers themselves do not reflect the minimal degree of creativity necessary for copyright protection. Second, R & B's part numbers are the sort of short phrases that the Court of Appeals decided are not copyrightable. Thus, the Court will grant the motion for summary judgment with respect to the plaintiff's claim that the defendants infringed R & B's copyright in its part numbers.

2. *1994 Catalog*

The plaintiff also claims that the defendants infringed R & B's copyright in its catalogs. To establish infringement, the plaintiff must show that R & B owns a valid copyright in the work and that the defendants copied that work. *Whelan Assocs.*, 797 F.2d at 1231. For purposes of this motion, the defendants do not dispute that R & B owns a valid copyright in its catalogs; however, the defendants argue that they are entitled to summary judgment because the plaintiff cannot show that NPM copied R & B's catalogs.

█ Copying is established by showing that the defendants had access to the plaintiff's work and that there is substantial similarity between the two works. *Id.* at 1231–32; *see also Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 907 (3d

Cir.1975). The defendants admit to using the plaintiff's catalog for research, but they deny copying it. Tr. II at 42 (testimony of James Koleszar). Thus, the issue is whether there is substantial similarity between the R & B's catalogs and NPM's catalog.

■ The test for "substantial similarity" contains two parts. *Whelan Assocs.*, 797 F.2d at 1232. First, the factfinder must decide whether there is sufficient similarity between the two works to conclude that the defendants used the copyrighted work in making their own. *Id.* This is called the "extrinsic" test of substantial similarity, and it is used to establish the fact of copying. *Id.* This determination is generally made based on a visual comparison of the two works, but expert testimony may be received to aid the trier of fact. *Id.*

If the extrinsic test is satisfied, the factfinder must determine, from the perspective of an ordinary lay person, whether the copying was an unlawful appropriation of the copyrighted work. *Id.* This is called the "intrinsic" test of substantial similarity. *Id.* Only when access and both types of substantial similarity are shown is copying established.

■ The plaintiff concedes that its copyright infringement claim will rise and fall entirely on the legal significance of the fact that NPM copied R & B's part numbers, i.e., the plaintiff does not claim that the catalogs are substantially similar based on the artwork, layout, text, or photographs. *See* Oral Argument Tr. at 16–17 (statement of Anthony Volpe); *see also* Tr. I at 181–84 (testimony of Robert Calvosa). The plaintiff argues that in deciding whether the catalogs are substantially similar, the factfinder must consider the qualitative value of the material copied under the standard adopted by the Supreme Court in *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

R & B contends that the qualitative value of its part numbers is high because NPM copied the numbers of the best selling Motormite parts to make it easier for customers to switch to Needa? parts. In making this argument, R & B relies on the reasoning in *Educational Testing Services v. Katzman*, 793 F.2d 533 (3d Cir.1986), where the Court of Appeals found that the substantial similarity test was satisfied even though the defendant copied only a handful of questions out of thousands on a standardized exam.

At the preliminary injunction stage, the Court decided that the catalogs are not substantially similar because the amount of material copied from R & B's catalogs was a *de minimis* part of the catalogs as a whole. Thus, the Court concluded that the plaintiff was not likely to succeed on the merits of its copyright infringement claim. Although the Court of Appeals ultimately reached the same conclusion, it agreed with R & B that the Court should have applied the qualitative value standard. *R&B*, 50 Fed.Appx. at 523–24.

The Court of Appeals never discussed the qualitative value of R & B's part numbers, however, because the court found that the plaintiff failed to show that the defendants copied copyrightable information. *Id.* at 523. The Court of Appeals explained that the substantial similarity test must be analyzed with reference to material that is itself entitled to copyright protection. *Id.* at 523–34 (citing *Nimmer on Copyright* § 13.03[B][2] at 13–59, Melville B. Nimmer & David Nimmer (2002)).

The Court of Appeals further explained that the plaintiff's reliance on *ETS* was misplaced because in that case the court concluded that the individual test questions were copyrightable before reaching the question of substantial similarity. *Id.* at 524. Thus, the Court of Appeals concluded that the plaintiff could not establish

substantial similarity based on the qualitative value of its part numbers because the part numbers are not copyrightable material. *See id.*

The plaintiff relies on the same arguments here that were previously rejected by the Court of Appeals without directing the Court to any intervening case law or new evidence that would change the analysis. Having reviewed the evidence in a light most favorable to the plaintiff, the Court finds that no reasonable factfinder could conclude that the plaintiff has established copying by the defendants with respect to the plaintiff's catalogs.

### B. Trademark Claims

■■■■ The plaintiff claims that NPM infringed its rights in the unregistered trademarks "MM" and R & B's part numbers.[1] A trademark is a word, name, symbol, device, or other designation, or a combination of such designations, that is distinctive of a person's goods or services and that is used in a manner that identifies those goods or services and distinguishes them from the goods or services of others. Restatement (Third) of Unfair Competition § 9 (1995). "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983).

■■■■ To establish a claim of trademark infringement, R & B must demonstrate that (1) it has a valid and legally protectable mark; (2) R & B owns the mark; and (3) NPM's use of the mark is likely to cause confusion concerning the origin of the goods. *A & H Sportswear,* 237 F.3d at 210 (citations omitted).

■■■■ Unregistered marks are not entitled to a presumption of validity as are marks that are registered. *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 291–92 (3d Cir.1991); *see* 15 U.S.C. § 1057(b). Validity of an unregistered trademark depends on the mark's level of inherent distinctiveness. *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir.1986).

Marks are divided into four classifications depending on level of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Id.*

Generic terms are those that "function as the common descriptive name of the product class." *Id.* Descriptive terms convey "an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* at 297 (internal quotations and citation omitted). Suggestive marks require consumer "imagination, thought, or perception" to determine the identity of the product. *Id.* Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they "bear no logical or suggestive relation to the actual characteristics of the goods." *Id.* at 296 (internal quotations and citation omitted).

■■■■ To qualify for trademark protection, a mark must be suggestive, arbitrary, or fanciful; or it must be descriptive with a demonstration of secondary meaning. Generic terms are never entitled to protec-

---

1. R & B also brings claims for common law trademark infringement, false designation of origin under the federal law of unfair competition, and common law unfair competition. Under Pennsylvania law, the analysis of common law trademark infringement is governed by the same standards as federal trademark infringement. *Mateson Chemical Corp. v. Vernon,* 2000 WL 680020, at *5 n. 7 (E.D.Pa. May 9, 2000). Similarly, the analysis of unfair competition under both federal statutory and common law is the same as the analysis of federal trademark infringement. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 (3d Cir.2000); *Standard Terry Mills, Inc. v. Shen Mfg. Co.,* 803 F.2d 778, 780 n. 4 (3d Cir.1986).

tion. *A & H Sportswear*, 237 F.3d at 222 (citations omitted).

Secondary meaning exists where the mark "is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services." *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir.2000) (internal quotations and citations omitted). In other words, secondary meaning is acquired when the primary significance of a mark, in the minds of the consuming public, is to identify the product's source, rather than the product itself.

The United States Court of Appeals for the Third Circuit has identified a non-exhaustive list of factors that courts should consider in determining whether a mark has acquired secondary meaning: (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion. *Id.*

#### 1. *R & B's "MM" Mark*

The plaintiff claims that the defendants have infringed R & B's rights in the unregistered "MM" mark by selling genuine Motormite products that are imprinted with the "MM" designation. The defendants argue that R & B's "MM" mark is not valid and protectable because the mark is descriptive and R & B cannot show that the mark has acquired secondary meaning.

At the preliminary injunction stage, the plaintiff did not present evidence that the defendants sold products stamped with the "MM" mark. In connection with this summary judgment motion, the plaintiff introduced samples of products in Needa? packaging. Pl's. Exs. 1A–10. NPM products are sold in clear plastic packages affixed to blue and yellow cards. The automotive part can be seen through the plastic. Upon reviewing the product samples provided by the plaintiff, the Court notes that it can see the "MM" imprinted on some of the products. *See* Pl's. Exs. 1A–1C, 1G–1H, and 1J–10. In most cases, the Court had to manipulate the package and peer at the product to locate the "MM" imprint. In any event, the plaintiff has presented sufficient evidence to show that the defendants have offered products for sale that are stamped with the "MM" designation.

In deciding the motion for preliminary injunction, the Court held that even if the plaintiff did show use, it failed to show that the "MM" mark is valid and protectable because the evidence was insufficient to support a finding of secondary meaning. In affirming the Court's decision, the Court of Appeals agreed that R & B did not meet its burden of proving validity of the mark. *R&B*, 50 Fed.Appx. at 527.

The plaintiff now advances a new legal argument that was not raised in the preliminary injunction motion. The plaintiff contends that the letters "MM" are an abbreviation for MOTORMITE, and that as the term MOTORMITE is a fanciful mark, the abbreviation "MM" is entitled to protection without a showing of secondary meaning. The plaintiff does not argue that the "MM" mark is itself inherently distinctive. Rather, the plaintiff cites one 1994 case from the Southern District of New York in support of the legal proposition that an abbreviation should be treated as inherently distinctive if the underlying words are inherently distinctive. *See* Pl's. Post–Argument Brief at 5 (citing *GFC Fin. Corp. v. GFC Capital Res. Group, Inc.*, 1994 WL 30432 (S.D.N.Y. Feb.2, 1994)).

Even accepting this legal proposition as true, the Court finds that, at a minimum, the plaintiff must show that consumers associate the "MM" mark with Motormite. *See G. Heileman Brewing Co. v. Anheuser–Busch, Inc.,* 873 F.2d 985, 994–95 (7th Cir.1989) (stating that the distinctiveness of an abbreviation should be determined in light of the way that consumers perceive the abbreviation in relation to the underlying words or phrase). The plaintiff's argument makes no logical sense if consumers do not associate the "MM" mark with Motormite, i.e., the mark "MM" cannot take on the inherent distinctiveness of the Motormite mark if consumers do not know that "MM" is an abbreviation for Motormite.

The plaintiff did introduce some evidence to show that R & B's customers identify the "MM" designation with Motormite. This evidence consists of the following exchanges between counsel and the witness, a former regional sales manager for R & B, during the preliminary injunction hearing:

Q: Have you had any experience in your time in the field where people referred to Motormite just using the double M's?

A: Yes.

Tr. I at 235 (testimony of Todd Northey).

Q: [G]oing back to the MM for Motormite, is the MM in your experience recognized when it's on a part as indicating that the part originates from Motormite?

A: Yes.

*Id.* at 250.

Q: [H]as it been your experience in the industry as a sales individual for Motormite that people will refer to Motormite products using the MM?

A: Yes. We even have specific customers that even use MM as our line code in their own computer system.

*Id.* at 251.

As the Court of Appeals found when it affirmed the denial of the preliminary injunction, however, this evidence was "very thin." *See R&B,* 50 Fed.Appx. at 527. The plaintiff has introduced no additional evidence which would lead the Court to a different conclusion. Taking this evidence in the light most favorable to R & B as the non-moving party, the Court finds that no reasonable factfinder could conclude that the plaintiff has shown that the mark "MM" is valid and protectable. The Court will, therefore, grant the defendants' motion for summary judgment with respect to the plaintiff's claim that NPM's use of the "MM" mark infringes R & B's rights in that mark.

### 2. *R & B's Part Numbers*

The plaintiff claims that its part numbers serve as grade or style designations, and that the defendants' use of the part numbers constitutes trademark infringement. The defendants admit that they have used the plaintiff's part numbers, but the defendants argue that the plaintiff has not shown that the part numbers are legally protectable trademarks because there is insufficient evidence that the part numbers have acquired secondary meaning.

Grade or style designations are descriptive marks that are entitled to trademark protection only upon a showing of secondary meaning. *J.M. Huber Corp. v. Lowery Wellheads, Inc.,* 778 F.2d 1467, 1469 (10th Cir.1985); Thomas J. McCarthy, McCarthy on Trademarks and Unfair Competition § 11:37 (4th ed.1998).

To establish secondary meaning, R & B relies on the testimony of a former region-

al sales manager that he has witnessed customers ask for Motormite parts by the part number. Tr. I at 191, 212–16 (testimony of Todd Northey). The witness did not testify as to whether the customers associated the part number with R & B or with the part itself. The witness further stated that the customers were only familiar with the numbers of the most popular Motormite parts. *Id.* at 214.

Based on this scant evidence, the Court finds that no reasonable factfinder could conclude that the part numbers function as a source identifier for R & B's goods in the minds of consumers. The Court will grant summary judgment to the defendants on this claim.

### C. *Repackaging Claims*

 The plaintiff claims that NPM purchases Motormite parts and repackages them under the Needa? name. The plaintiff frames this as a trademark infringement claim, as well as a claim for false designation of origin and common law unfair competition. *See* Pl.'s Mem. in Opp. at 26 n. 12. The complaint states that the plaintiff's claim of false designation of origin relates to "Needa's misuse of MM, NEED! or Motormite trademarks." Complaint at ¶ 87. The plaintiff has stipulated that it is not pursuing a claim that NPM misused the Motormite trademark, and the defendants are not moving for summary judgment on the plaintiff's claims related to the NEED! trademark. Thus, for purposes of this motion, the Court will address the plaintiff's "repackaging" claims in relation to the defendant's practice of selling parts with the "MM" designation in Needa? packaging.

In denying the motion for preliminary injunction, the Court found that the plaintiff failed to show a likelihood of success on the merits on the repackaging claim because the defendants' repackaging did not involve any of the plaintiff's trademarks.

The Court of Appeals affirmed the Court's decision stating that the repackaging claim fails for the same reason as the plaintiff's "MM" trademark infringement claim, i.e., because the plaintiff did not carry its burden of showing that the "MM" mark is valid. 50 Fed.Appx. at 527.

The plaintiff introduced new evidence to support its repackaging claim. *See* Myers Decl., Pl's. Ex. 1. Barry Myers, the plaintiff's Vice President and General Counsel, stated that R & B markets the HELP! line of products toward DIY members of the public as safe and easy to use. Myers Decl., Pl's. Ex. 1 at 4–5. R & B includes instructions on the HELP! product packages to show DIYers how to use the product. Pl's. Ex. 1P. The Needa? packaging does not contain this kind of information. According to Myers, the lack of information on Needa? packaging increases the likelihood that consumers will install the product incorrectly. Myers Decl., Pl's. Ex. 1 at 5–6. The plaintiff contends that any resulting consumer dissatisfaction will be directed toward R & B because the "MM" mark is stamped on the product.

This new evidence does not address the issues raised by this Court or the Court of Appeals at the preliminary injunction stage. As the Court discussed in the previous section, the plaintiff has not introduced any evidence to show that DIY consumers associate the "MM" mark with R & B. Thus, even if consumers are more likely to misuse products sold under the Needa? name, there is no evidence to support the plaintiff's position that consumers will direct their dissatisfaction toward R & B. The Court will grant the defendant's motion for summary judgment on the plaintiff's repackaging claims.

### D. *Other State Law Claims*

 The plaintiff brings three claims under state law: breach of contract; tor-

tious interference with contractual relations; and breach of fiduciary duty. At the oral argument on the motion for summary judgment, counsel for the plaintiff stated that each of these claims is based on the plaintiff's allegation that Mr. Koleszar used confidential information that he obtained while working for R & B in his work for NPM.

The confidential information the plaintiff claims that Mr. Koleszar had and disclosed has changed over time. Initially, the plaintiff moved for a temporary restraining order to prevent Mr. Koleszar from using information concerning the 500 most profitable parts sold by R & B. At the time of the preliminary injunction hearing, the plaintiff withdrew its request for an injunction based on the disclosure of confidential information because the discovery process that preceded the injunction hearing revealed that Mr. Koleszar had not had access to the information concerning the profitability of the parts. The plaintiff's own witness testified to this fact. The plaintiff apparently based its claim that the defendants used information on profitability on the fact that the defendants were selling the 500 fastest moving items that were also the most profitable. But the information regarding the plaintiff's fastest moving items was public. *See* Transcript of Preliminary Injunction Hearing, April 18, 2001, at 12–14.

In its opposition to the defendant's summary judgment motion, the plaintiff did not set forth specifically what confidential information it now claimed the defendants had access to and used. Instead, the plaintiff complains that it needs more discovery. This case is four years old and the time for discovery is over. The plaintiff should have come to the Court earlier to request more discovery. The plaintiff has not filed a Rule 56(f) affidavit, setting forth what it needs and why the additional information would change the result here.

As best as the Court can understand the argument at this point, the plaintiff claims that Mr. Koleszar had some confidential information with respect to customers that he used to decide on which customers to call. Mr. Myers, a witness for the plaintiff, testified that the existence of R & B's customers is not confidential. Indeed, R & B discloses the list of some of their customers to the Securities and Exchange Commission as mandated by law. He also conceded that Mr. Koleszar was not permitted access to certain information including the general ledger, the accounts payable system, any balance in the accounts receivable system, or the vendor system, which includes vendor pricing. Nor was Mr. Koleszar privy to profit margins for individual parts. The plaintiff has not come forward with any evidence that Mr. Koleszar had access to any confidential information that he thereafter disclosed to anyone. Summary judgment will be granted on these state law claims.

An appropriate order follows.

### ORDER

AND NOW, this 23rd day of August, 2005, upon consideration of Defendants, Needa Parts Manufacturing, Inc. and James Koleszar's Motion for Summary Judgment (Docket No. 86), Plaintiff's Memorandum of Law in Response to Defendants' Motion for Summary Judgment (Docket No. 95), Bench Memo in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Docket No. 104), and a hearing on April 6, 2005, IT IS HEREBY ORDERED that, for the reasons set forth in a memorandum of today's date, the defendants' motion for summary judgment is GRANTED. Summary Judgment is granted on all claims except for the claim that the defendants

infringed R & B's registered trademark "Need!."